# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TODD SCOTT FRASHUER, | ) | CASE NO. 5:11-cv-00314 |
| | ) | |
| Petitioner, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| KIMBERLY CLIPPER, Warden | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Todd Scott Frashuer ("Frashuer"), challenges the constitutionality of his conviction in the case of *State v. Frashuer*, Summit County Court of Common Pleas Case No. CR-08-124067.  Frashuer, *pro se*, filed his Petition for a Writ of Habeas Corpus (ECF No. 1) pursuant to 28 U.S.C. § 2254 on February 14, 2011.  On June 13, 2011, Warden Kimberly Clipper ("Respondent") filed her Answer/Return of Writ.  (ECF No. 5.)  Frashuer filed a Traverse on August 22, 2011.  (ECF No. 8.)  For reasons set forth in detail below, it is recommended that Frashuer's petition be DENIED.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also House v. Bell*, 283 F.3d 37 (6th Cir. 2002).  The state appellate court summarized the facts underlying Frashuer's conviction as follows:

[*P2]  On December 10, 2008, Todd Frashuer was at a home at 721 Beechview Drive in Akron, Ohio.  The home was rented by Donneall Cate, the mother of two of Frashuer's children.  While there, Frashuer encountered another man, Jody Simone, whom Frashuer believed was drunk.  Frashuer claims he also became aware that Simone was involved with drugs.  Frashuer became upset and the two men got into a physical altercation.  As the fight spilled out to the front yard, Frashuer realized that a neighbor was calling the police.  Knowing that he had a warrant for his arrest due to non-payment of child support, Frashuer left the home.

[*P3]  Later in the day, Cate called Frashuer to tell him to return to the house because the police had left.  When Frashuer returned, he went down to the basement.  While he was down there, members of the Summit County Drug Task Force arrived at 721 Beechview.  They had received an anonymous tip that there was a methamphetamine lab in the house and intended to also arrest Frashuer on his outstanding warrant.

[*P4]  Detective Susan Barker went to the front door while another detective stood at the home's rear entrance to be sure that no one left.  A child looked out of the window when Det. Barker knocked.  Det. Barker showed the child her sheriffs badge and the child disappeared from the window.  While Det. Barker was waiting for someone to answer the door, she noticed a male figure inside near the rear of the house, then the figure disappeared, likely into the basement.

[*P5]  Cate answered the door and Det. Barker stated that she was looking for Frashuer.  Cate directed her to the basement.

[*P6]  Frashuer was waiting at the bottom of the basement stairs and Det. Barker placed him under arrest.  While in the basement, Det. Barker noticed the distinctive odor indicative of the crystallization phase of methamphetamine production.  Also, in plain view she observed items associated with methamphetamine production, including numerous matchbooks and matchbook covers with the matches removed, Mason jars, and coffee filters.  Det. Barker also heard other people moving around in the basement.  She secured a search warrant for the house.

[*P7]  While waiting for the search warrant, Det. Robert Scalise, also of the Drug Task Force, remained in the home's living room with Frashuer, Cate, and their two daughters, J.F., age ten, and M.F., age five.  Det. Scalise testified that the home smelled and was messy and dirty. Specifically, there was trash, food wrappers, and even old food strewn about the floor.  During this time, one of the children became hungry.  Det. Scalise went to the kitchen to get her some food, however, there was no food in the house and only an onion and a stick of butter in the refrigerator.  He was eventually able to find a cup of yogurt, but he was not able to give it to the child because there were no clean dishes with which she

-2-

could eat the yogurt.  In general, Det. Scalise believed that the condition of the house was unsanitary.

[*P8]  When the search warrant arrived, Dets. Barker, Scalise, Thomas Gottas, and Michael Yovanno, all of the Drug Task Force, participated in the search.  Det. Scalise searched the home's master bedroom.  He discovered a digital scale and a homemade pipe of tinfoil used to smoke methamphetamines.  Det. Gottas remained on the first floor and compiled the inventory of the items recovered by the detectives executing the search.  He also stated that the home was in such disarray that it was difficult to move around and there was no food for the children to eat.

[*P9]  Dets. Barker and Yovanno searched the basement dressed in protective gear.  In a bedroom in the basement, Det. Yovanno found a cigar box containing razor blades, a scraper, and a glass pipe used to smoke methamphetamines.  He also found other drug paraphernalia, including syringes and a burnt spoon.  A bulletproof vest was hanging in the bedroom closet.  Det. Yovanno also found a coat with identification for Mark Teets.  He stated that it did not seem as though Teets lived at 721 Beechview. However, John Thomas rented another bedroom in the basement from Cate.  No paraphernalia was found in Thomas' room and he told the detectives he was mentally handicapped due to a severe head injury.

[*P10]  In the workshop area in the basement, the detectives found apparatus used to manufacture methamphetamines, such as, a hotplate, a butane torch, rubber tubing, heavy rubber gloves and coffee filters.  One of the coffee filters was stained with a reddish-brown color indicative of a chemical reaction in the methamphetamine production process.  Another coffee filter contained 1.6 grams of usable methamphetamine.

[*P11]  Det. Barker, an expert on clandestine methamphetamine labs, found equipment and large quantities of chemicals necessary for methamphetamine production in the basement.  She recovered gallon jugs of muriatic acid, acetone, a three-pound container of iodine, eight bottles of lye, and pseudoephedrine.  She also identified an amount of red phosphorus that had been extracted from the striker plates on the matchbooks.  The equipment found consisted of glassware and tubing, rubber stoppers, masks and latex gloves.  Some of the equipment was stained or damp, indicating recent chemical processing of methamphetamines.  Some of the items Det. Barker found were contained in a wooden box and a cardboard box from an electronic basketball game.  Photographs taken during the search show that the items had been neatly packed and some of them were protectively wrapped in newspaper.  Det. Barker also recovered a homemade apparatus used in one phase of the production process.

[*P12]  Frashuer and Cate were arrested in light of the items found during the

-3-

search of 721 Beechview. Deputy Charles Brown booked Frashuer into the jail
that night. He stated that Frashuer's ticket listed 721 Beechview as his address and
Frashuer gave that address when asked for the information by Dep. Brown.

 [*P13]  The day after Frashuer's arrest, Lauren Clark, a caseworker with the
Summit County Board of Children's Services ("CSB") visited him in the jail to
notify him that J.F. and M.F. were in the custody of CSB.  Frashuer admitted to
Clark that he had been manufacturing methamphetamines in the basement of 721
Beechview to earn money since he had lost his job.

[*P14]  Frashuer pled not guilty to illegal manufacture of drugs, illegal assembly
or possession of chemicals for the manufacture of drugs, aggravated possession of
drugs, and four counts of child endangering.  At trial, Frashuer testified that he
did not live at 721 Beechview and was only there on December 10, 2008, to visit
his children, something Cate rarely allowed.  He also claimed that he did not have
any knowledge of the methamphetamine lab in the basement before that day.
Further, when the police arrived, he was packaging the chemicals and equipment
to dispose of them because he did not want a methamphetamine lab in the home
in which his children lived.  He also contended that case worker Clark never came
to visit him in jail, thus, he never admitted to her that he manufactured
methamphetamines.  The jury found Frashuer guilty of all charges.  Frashuer then
filed the instant appeal.

*State v. Frashuer*, 2010 Ohio App. LEXIS 522, 2010-Ohio-634 at ¶¶2-14 (Ohio Ct. App., Feb.

24, 2010).

## II.  Procedural History

### A.   Conviction

On December 30, 2008, a Summit County Grand Jury charged Frashuer with one count of

illegal manufacture of drugs in violation of Ohio Revised Code ("O.R.C.") § 2925.04(A), four

counts of endangering children in violation of O.R.C. § 2919.22, one count of aggravated

possession of drugs in violation of O.R.C. § 2925.11(A), one count of illegal assembly or

possession of chemicals for the manufacture of drugs in violation of 2925.041(A), and one count

of possessing criminal tools in violation of O.R.C. § 2923.24. (ECF No. 5-1, Exh. 1.)  On April

14, 2009, a jury found Frashuer guilty as charged, except that the count regarding possession of

-4-

criminal tools was dismissed upon the recommendation of the prosecutor.  (ECF No. 5-1, Exh. 3.)  On May 1, 2009, the trial court sentenced Frashuer to an aggregate term of nine years incarceration.  (ECF No. 5-1, Exh. 4.)

**B.    Direct Appeal**

On May 26, 2009, Frashuer, through counsel, filed a Notice of Appeal with the Court of Appeals for the Ninth Appellate District ("state appellate court"), raising the following assignments of error:

> Assignment of Error No.1: Appellant's convictions of illegal manufacture of drugs, child endangering, aggravated possession of drugs, and illegal assembly or possession of chemicals for the manufacture of drugs, were contrary to the manifest weight of the evidence.
>
> Assignment of Error No. 2: The trial court erred in failing to grant appellant's Criminal Rule 29 motion to dismiss the illegal manufacture of drugs, child endangering, aggravated possession of drugs, and illegal assembly or possession of chemicals for the manufacture of drugs charges following the State's case and at the conclusion of the evidence.
>
> Assignment of Error No. 3: Whether trial counsel's representation was deficient and effected the outcome of the case.

(ECF No. 5-1, Exhs. 5 & 7.)

On February 24, 2010, Frashuer's conviction was affirmed.  (ECF No. 5-1, Exhs 9 & 10.)

On April 22, 2010, Frashuer, *pro se*, asked for leave to file a delayed appeal with the Supreme Court of Ohio.  (ECF No. 5-1, Exhs. 12 & 13.)  On June 9, 2010, leave was granted. (ECF No. 5-1, Exh. 14.)  On June 24, 2010, Frashuer raised propositions of law identical to those raised before the lower court.  (ECF No. 5-1, Exh. 15.)  On September 29, 2010, the appeal was dismissed as not involving any substantial constitutional question.  (ECF No. 5-1, Exh. 16.)

**C.  Federal Habeas Petition**

On February 14, 2011, Frashuer filed a Petition for Writ of Habeas Corpus and asserted

the following grounds for relief:

> **GROUND ONE**: "Due process rights under V and XIV Amendments to U.S.
> Constitution insufficiency of evidence and mens rea element, knowingly, absent
> in all charges and trial court denied motion to dismiss thereby violating
> Petitioner's due process rights."
>
> <u>Supporting Facts</u>: Petitioner's conviction relied on evidence and information that
> equally applied to two other men who shared the premises and were present when
> evidence was found yet they were neither prosecuted or even charged with a
> crime; Petitioner was the focus of prosecution because of a former relationship
> with woman who also resided at the premises and Petitioner was unaware of the
> drug related activity going on in the residence.
>
> **GROUND TWO**: Trial counsel's representation of Petitioner was ineffective and
> effected the outcome of Petitioner's jury trial violating Petitioner's rights under
> V, VI, and XIV Amendments to U.S. Constitution.
>
> <u>Supporting Facts</u>: The jury in Petitioner's trial was never required to take the
> jurors' oath until it had reached the verdict and this action was never objected to
> by the defense attorney.  The jury, without being properly instructed and
> administered the oath by the judge, was able to hear testimony, view evidence,
> and otherwise participate in a legal proceeding that was less than legally and
> constitutionally correct.  Defense counsel's representation of petitioner fell below
> accepted standards thereby violating Petitioner's constitutional rights under the V,
> VI, and XIV Amendments to the United States Constitution."

(ECF No. 1.)

### III.  Exhaustion and Procedural Default

**A.  Exhaustion Standard**

State prisoners must exhaust their state remedies prior to raising claims in federal habeas

corpus proceedings.  *See* 28 U.S.C. § 2254(b),( c).  This requirement is satisfied "when the

highest court in the state in which the petitioner was convicted has been given a full and fair

opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th

-6-

Cir. 1990).  However, if relief is no longer available in state court, exhaustion can be rendered moot:  "If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and prejudice exist to excuse the failure to present the claim in the state courts."  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 347, 349 (6th Cir. 2001).

## B.  Procedural Default Standard

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir.2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). A claim may become procedurally defaulted in two ways. *Id*.  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court.  *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[1] *Id*.

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures."  *O'Sullivan v. Boerckel*,

---

[1]  In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted.  785 F.2d at 135.  Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice."  *Id*. at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002).

526 U.S. 838, 848 (1999).  If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).  This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review.  *Id*.  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Id*. Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id*.

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue--not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir.

-8-

2003).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error.  *See Maupin*, 785 F.2d at 138-39.  "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule."  *Franklin v. Anderson*, 434 F.3d 412, 417 (6ᵗʰ Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error."  *Id*.  Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied.  *See United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6ᵗʰ Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6ᵗʰ Cir. 1994).  Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different.  *See Mason v. Mitchell*, 320 F.3d 604, 629 (6ᵗʰ Cir. 2003) (*citing Strickler v. Greene*, 527 U.S. 263, 289 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice."  *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).  Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995)*; See Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D.Ohio 2007).

-9-

## C. Analysis

Respondent asserts that Frashuer's insufficient evidence claim, raised in ground three of the petition, is procedurally defaulted. (ECF No. 5 at 10-12.) It is undisputed that Frashuer raised the argument that his conviction was against the manifest weight of the evidence before both the state appellate court and the Ohio Supreme Court. Frashuer also argued on appeal that his conviction was not supported by sufficient evidence. (ECF No.1, Exh. 7 at 13-15.) The state appellate court noted Frashuer's assignment of error, but concluded as follows:

> Frashuer offers no further development of this argument but concludes that this Court should reverse the conviction on the charges. He has not cited to any of the applicable statutes, legal authority or the record of this case. See App.R. 16(A)(7). Thus, we decline to speculate as to what Frashuer's specific arguments might be regarding the sufficiency of the evidence relating to the possession or manufacture of the illegal drugs. *Catanzarite v. Boswell*, 9th Dist. No. 24184, 2009 Ohio 1211, at PP16-17.

*State v. Frashuer*, 2010 Ohio App. LEXIS 522, 2010-Ohio-634 at ¶¶2-14 (Ohio Ct. App., Feb. 24, 2010).

Respondent avers that the *Maupin* test supports default because Frashuer failed to comply with an applicable state procedural rule – Ohio Appellate Rule 16(A)(7), and the state appellate court actually enforced the sanction. Respondent further argues that App. R. 16(A)(7) constitutes a firmly established "independent and adequate" state procedural bar which forecloses federal review. (ECF No. 5 at 10-11.) However, in *Nash v. Eberlin*, 258 Fed. Appx. 761, 764-765 (6th Cir. 2007), the Sixth Circuit found that a petitioner "did not procedurally default on his sufficiency of the evidence claim by not presenting it to the Ohio state courts" despite the fact that the petitioner therein "did not literally argue that there was insufficient evidence to support his conviction." The *Nash* court explained that "the sufficiency of the

-10-

evidence issue was adequately passed upon by the Ohio courts because the determination by the Ohio Court of Appeals that the conviction was supported by the manifest weight of the evidence necessarily implies a finding that there was sufficient evidence." *Id.*

This Court declines to address the procedural default issue, and will instead proceed to address the merits of Frashuer's claims. The United States Supreme Court has observed that federal courts are not required to address a procedural default issue before deciding against a petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). The Sixth Circuit has also approved this rule where the procedural default question is complicated and unnecessary to the court's determination of the case. *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Jackson v. Anderson*, 141 F. Supp.2d 811, 826-27 (N.D. Ohio 2001).

### IV.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997). The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States

Supreme Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

**A. Ground One: Sufficiency of the Evidence**

In ground one of his petition, Frashuer argues that his convictions were not based on sufficient evidence.  (ECF Nos. 1, 8.)

The Due Process clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged.  *In re Winship*, 397 U.S. 358, 363-64 (1970).  The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 317 (1979).  In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses.  *See id.*; *Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983).  Moreover, federal courts are required to give deference to factual determinations made in state court and "[a]ny conflicting inferences arising from the record ... should be resolved in favor of the prosecution."  *Heinish v. Tate*, 9 F.3d 1548, 1993 WL 460782 (6th Cir. 1993) (unpublished opinion), *citing Walker*, 703 F.3d at 969-70; *Wright v. West*, 505 U.S. 277, 296 (1992) (the deference owed to the trier of fact limits the nature of constitutional sufficiency review.)  While the state appellate court did not address the merits of Frashuer's sufficiency claim, it upheld Frashuer's conviction under the standard governing manifest weight of the evidence claims.[2]  The court engaged in the following thorough discussion of the evidence supporting Frashuer's convictions:

> [*P18]  Frashuer suggests that his conviction is against the manifest weight of the evidence because there was conflicting testimony and evidence.  It is true that

---

[2] "'Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency.'  Thus, a determination that a conviction is supported by the weight evidence will also be dispositive of the issue of sufficiency."  *Nash*, 258 Fed. Appx. at 764-65 (*quoting State v. Lee*, 158 Ohio App.3d 129, 814 N.E.2d 112, 115 (2004)).

Frashuer's testimony directly contradicted that of the State's witnesses.  Frashuer implicitly complains that because it is apparent that the jury chose not to believe his version of events, his conviction is against the manifest weight of the evidence.  However, the mere fact that the jury chose to disbelieve much of Frashuer's testimony does not equate to a manifest miscarriage of justice.

[*P19]  Frashuer also contends that his convictions for manufacturing and possession of illegal drugs and child endangering are against the manifest weight of the evidence because "the evidence had shown that [Frashuer] did not live in the residence, did not possess with the intent to manufacture, and did not have custody of his children[.]"  Beyond this statement and Frashuer's partial recitation of the evidence, Frashuer has failed to develop his argument so that this Court can understand why these three allegations, if true, warrant reversal of his convictions.  Notwithstanding, this Court has undertaken a thorough review of the evidence adduced at trial.  We cannot say that the jury lost its way and created a manifest miscarriage of justice when it found Frashuer guilty of the charged offenses.

[*P20]  Despite Frashuer's failure to develop his argument, he does contend that the finding that he resided at 721 Beechview is against the manifest weight of the evidence.  However, although Frashuer testified that he did not live at the Beechview residence, there was evidence to the contrary.  After his arrest and during booking, Frashuer told a deputy that his address was 721 Beechview.  Det. Barker testified that she had personal knowledge that Cate and Frashuer lived at the Beechview residence.  In addition, the State also presented an audio recording of a telephone call Frashuer made while he was in jail.  Frashuer spoke about whether or not he should try to call his house because he assumed Cate, who was also arrested on December 10, 2008, was out of jail and wondered if she would be there to speak with him.  Frashuer also spoke about waiting for the search warrant for 721 Beechview to arrive and mentioned waiting in "my house" for over an hour.  Although Frashuer testified that he did not live at 721 Beechview, we cannot say that the jury lost its way in finding otherwise.

[*P21]  Frashuer also contends that the evidence demonstrated that he "did not possess with the intent to manufacture."  This statement itself is ambiguous in that it suggests that although he might have possessed drugs, he did not intend to manufacture them.  Notwithstanding that ambiguity, we assume that Frashuer contends that the jury's findings that he possessed drugs as well as had the intent to manufacture are against the manifest weight of the evidence.  At trial, Frashuer denied that the methamphetamine found in the home was his.  He also denied that the paraphernalia used to manufacture the methamphetamine was his.  This argument was in part founded upon his contention that he did not live at the home. He also contended that when he was at the Beechview residence on the day of the arrest, he had an altercation with a person who was consuming drugs in the

-14-

home. He stated he left the home after the altercation because he knew he had a warrant for his arrest and a neighbor had called the police.  Later, when he returned to the home, he stated that he found the methamphetamine lab and began to pack it up because he knew that it was hazardous to his children.

[*P22]  The jury also heard evidence that conflicted with Frashuer's version of events.  Clark, the CSB caseworker, visited Frashuer in jail on December 11, 2008.  The purpose of her visit was to inform him that J.F. and M.F. had been placed in CSB custody.  Clark explained that placement was made because Frashuer was charged with operating a methamphetamine lab in his home.  She further testified that Frashuer admitted that he had been "cooking" methamphetamines for a few weeks because he had lost his job.  He admitted that he had set up the lab in the basement, but stated that the children were told to not go in the basement.

[*P23]  Det. Barker found Frashuer in the basement where he was found with chemicals and supplies used to produce methamphetamine.  Frashuer does not deny that he was in the basement where the methamphetamine lab was located.  Instead, he testified that his purpose for being in the basement was to pack up the lab.  He stated that although he was not in the basement previously, upon his return to the house he went straight to the basement to dispose of the methamphetamine lab.  He did not adequately explain how he knew that the lab was there.  He placed the items in a toolbox, a cooler, and the box from the electronic basketball game.  Frashuer recognized the purpose for the items in the basement because he had prior involvement with methamphetamine production and the police previously searched a different residence of his on the suspicion that he was manufacturing methamphetamines.  While he was packing up the chemicals and supplies, the detectives from the Drug Task Force knocked on the front door.  Frashuer peacefully surrendered to Det. Barker when she came into the basement.  Frashuer also suggested that the drugs and paraphernalia belonged to the other residents of the home or Jody Simone.

[*P24]  In the face of evidence that Frashuer admitted to a CSB caseworker that he manufactured methamphetamine in the basement of the Beechview home and evidence that Frashuer was in the basement of the Beechview home packing up the methamphetamine lab, we cannot say that the jury lost its way in finding that Frashuer possessed with intent to manufacture.

[*P25]  The relevant intent required to establish that a person has illegally manufactured drugs is knowingly. R.C. 2925.04(A).  "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).  There was an abundance of evidence presented a trial that there was

-15-

a methamphetamine lab in the basement of 721 Beechview. The characteristic odor of methamphetamine production permeated the residence. All the necessary chemicals and equipment, some of which was homemade, were located in the basement.  Although some of the items, such as iodine and matchbooks, are common, household items, the quantity present and the condition of some of the items indicated that they were not being used in a common, household manner. Some of the manufacturing apparatus was stained or damp, suggesting that the equipment had recently been used.  The detectives also discovered usable methamphetamine and paraphernalia for ingesting the drug.

[*P26]  Frashuer maintained that when the detectives arrived he was attempting to pack the equipment and chemicals to be disposed of, however, the photographs show that the articles were neatly packed and protectively wrapped in newspaper when necessary.  Frashuer's own testimony established that he is familiar with the process and tools required to produce methamphetamines because he has participated in the process in the past.  The testimony of Clark further undermines Frashuer's claim.  She stated that the day after his arrest, he admitted to manufacturing methamphetamines in the basement of his children's home because he needed the money.

[*P27]  Additionally, Frashuer has argued that he could not be convicted of child endangering because he did not have custody of J.F. and M.F.  Although Frashuer does not specify in his brief which subsection of the child endangering statute of which he could not be convicted due to lack of custody, neither subsection provides that a person charged with such a violation must have custody of the children at issue.

[*P28]  Frashuer was convicted of two counts of child endangering pursuant to R.C. 2919.22(A) and two counts pursuant to R.C. 2919.22(B)(6).  R.C. 2919.22(A) states that "[n]o person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * *, shall create a substantial risk to the health or safety of the child * * *." R.C. 2919.22(B)(6), concerning endangerment stemming from a child's proximity to the manufacture of illegal drugs or chemicals used in the manufacturing process, mandates that "[n]o person" shall permit a child to be within one hundred feet of such violations.  Frashuer has not argued before this Court that he is not the parent of J.F. or M.F. and admitted at trial that the girls are his children.  Moreover, Frashuer has not provided this Court with authority to support his assertion that his convictions for child endangering are improper because, as he claims, he does not have legal custody of the girls.  Accordingly, Frashuer's argument on this point is not well taken.

[*P29]  For purposes of the charges brought pursuant to R.C. 2919.22(A), Det. Barker stated that the house was quite dirty and messy, that trash and food were

-16-

lying around on the floors, and that one bedroom was so full of junk that it was difficult to move around.  Additionally, the kitchen sink was so full of dirty dishes that the faucet could not be turned on.  One of the girls had a cat litter box in her bedroom with waste in it, some of which had spilled out of the box and onto the floor. She also noticed that the hazardous gasses from the methamphetamine lab had permeated the first-floor living area of the ranch-style home.  She estimated that the methamphetamine lab was approximately fifty feet from the children's living area.  This fact supports Frashuer's charges for child endangering pursuant to R.C. 2919.22(B)(6).

[*P30]  Frashuer argues that there were conflicts in the evidence.  Most notably, his version of events differed significantly from that of the State's witnesses.  The jurors are charged with the duty to evaluate the credibility of the witnesses and in so doing, are free to believe the testimony of the State's witnesses and disbelieve the defense witnesses.  *Id.*  Based on the evidence presented at trial, the jury could find that Frashuer lived in the house and participated in the production of methamphetamines.  Based on our review of the evidence, we do not find that the jury lost its way in so finding.  This is not the extraordinary case in which the evidence weighs heavily in favor of the defense.  *Flynn* at P9, citing *Otten*, 33 Ohio App.3d at 340.  Accordingly, we hold that the State met its burden of persuasion and the jury did not lose its way when it found Frashuer guilty of the charges of illegal manufacture of drugs, illegal assembly or possession of chemicals for the manufacture of drugs, aggravated possession of drugs, and child endangering. *Cepec* at P6.

*Frashuer*, 2010 Ohio App. LEXIS 522 at ¶¶18-30.

Though his argument is not entirely clear, Frashuer appears to believe that his convictions cannot stand because two other men "shared the premises" where the drug laboratory was located and because, according to his own testimony, he did not reside at the house and was unaware of the drug related activity occurring therein.  (ECF Nos. 1, 8.)  Although a large portion of the evidence against Frashuer was indeed circumstantial, "[i]n assessing the proof, a court may sustain a conviction based upon nothing more than circumstantial evidence."  *Stewart v. Wolfenbarger*, 595 F.3d 647, 656 (6th Cir. 2010) (*citing See United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)).  In addition, "circumstantial evidence and direct evidence are accorded the same weight . . . ."  *United States v. Harris*, 2011 U.S. App. LEXIS 22278 (6th Cir., Nov. 1,

2011) (*quoting United States v. Sherlin*, 67 F.3d 1208, 1214 (6th Cir. 1995) (citation omitted)). As such, Frashuer's arguments – that he did not live in the residence where the drug lab was found and that he was unaware of the drug activity occurring therein – is unavailing.

The state appellate court's decision was neither contrary to, nor an unreasonable application of clearly established federal law, and its determination of the facts in light of the evidence presented was also reasonable.  Nonetheless, this Court has conducted its own independent review of the trial transcript.  The state appellate court's recitation of the evidence is accurate. Although Frashuer denied living in the house located at 721 Beechview or having any knowledge as to the drug laboratory located therein, Children's Services worker Lauren Clark testified that she went to the Summit County jail to speak with Frashuer to notify him that his two children were in the custody of Children's Services.  (ECF No. 5-4, Tr. 159-61.)  She further testified that Frashuer admitted to her that he had been "cooking meth" in the basement for a few weeks, as he had been out of work.  *Id*. at 162-63.  Police Officer Charles Brown testified that he was working at the booking office the night Frashuer was arrested, and that Frashuer gave 721 Beechview as his home address.  (ECF No. 5-5, Tr. 202-08.)  Police Officer Michael Yovanno of the Summit County Drug Unit testified that he was at the 721 Beechview house when Frashuer was arrested.  (ECF No. 5-4, Tr. 166-68.)  Officer Yovanno testified extensively as to the presence of drug paraphernalia (Tr. 171-74) and the presence of items used in the methamphetamine production process.  (Tr. 173-82.)

With respect to the child endangerment charges, Robert Scalise, a member of the Summit County Drug Unit, was with Det. Barker at the Beechview house.  Scalise testified as to the presence of Frashuer's minor children, the general dirty and unsanitary state of the house, and

the lack of any food.  (ECF No. 5-4, Tr. 123, 128-340.)  He also authenticated numerous photographs of the interior of the house, which were submitted to the jury as exhibits one through twelve.  (ECF No. 5-4, 132-140.)  Scalise's testimony regarding the presence of Frashuer's minor children and the unsanitary conditions in the house was corroborated by the testimony of Thomas Gottas, a police officer with the Stow Police Department.  (ECF No. 5-4, Tr. 149, 151-53.)

Frashuer's argument that others lived at the house but were not charged is immaterial to whether his conviction was supported by evidence sufficient to support a conviction.  Finally, his assertion that he did not live at the residence comes down to a credibility issue reserved to the trier of fact.  The jury was free to disbelieve Frashuer's self-serving testimony that he did not reside at 721 Beechview, especially in light of the evidence to the contrary.

Construing the evidence in a light most favorable to the prosecution, Frashuer's conviction was supported by sufficient evidence.  Therefore, his first ground for relief is without merit.

### B.  Ground Two: Ineffective Assistance of Trial Counsel

In ground two of the petition, Frashuer alleges that his trial counsel did not object to the belated administration of the jury oath, which was not done until after the verdict was reached but before it was announced.  (ECF No. 1, 8.)  Factually, Frashuer's assertion appears to be correct.  On April 14, 2009, the trial judge observed as follows:

> Just to prove to you that judges are not perfect, I realize that I swore you in as a panel with everyone.  I'm also supposed to swear you in individually as a 12 person jury and I didn't do that at the beginning before you rendered your verdict, so I'm going to ask you all to raise your right hand and state after me.

(ECF No. 5-7, Tr. 439-40.)  Thereafter, the jury was sworn and proceeded to announce its verdict.  *Id*.

-19-

To establish ineffective assistance of counsel, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985).  A petitioner also must demonstrate that trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair.  *Id*.  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Mere disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy.  *Id*. at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  Because the state courts adjudicated Frashuer's claims on the merits, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011); *Kennedy v. Warren*, 2011 WL 1642194, *2 (6th Cir. May 3, 2011).

The state appellate court addressed Frashuer's argument as follows:

-20-

[*P35]  In his final assignment of error, Frashuer claims that trial counsel was ineffective.  Frashuer points to the fact that the trial court failed to administer the oath to the jury after they were empanelled.  Instead, the judge administered the oath to the venire before voir dire then, to the seated jurors before the verdict was read in court.  Frashuer argues that trial counsel should have objected to the irregularities with respect to the oath and his failure to do so constitutes ineffective assistance.

[*P36]  In order to prove that trial counsel was ineffective, a defendant must demonstrate: (1) deficiency in his attorney's representation and, (2) that the deficiencies prejudiced his defense.  *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373.  Deficiency of representation "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.  Prejudice to the defense "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*.  To succeed on his claim, the defendant must establish both elements, because "'[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" (Internal citation omitted.) *Bradley*, 42 Ohio St.3d at 142, quoting *Strickland*, 466 U.S. at 691.

[*P37]  In examining a claim of ineffective assistance, "[a]n appellate court may analyze the prejudice prong of the *Strickland* test alone if such analysis will dispose of a claim of ineffective assistance of counsel on the ground that the defendant did not suffer sufficient prejudice." *State v. Kordeleski*, 9th Dist. No. 02CA008046, 2003 Ohio 641, at P37, citing *State v. Loza* (1994), 71 Ohio St.3d 61, 83, 1994 Ohio 409, 641 N.E.2d 1082.  Thus, we shall begin our analysis by considering whether Frashuer has demonstrated prejudice from the alleged deficiencies of trial counsel.

[*P38]  In his brief, Frashuer makes no argument with respect to prejudice.  Although the brief states: "Said lack of an objection [to the improper timing of the jury oath] prejudiced the defense[,]" this conclusory statement is not supported by facts from the record evidencing the prejudicial effect of trial counsel's lack of objection.  As Frashuer has not demonstrated a reasonable probability that trial counsel's failure to object affected the outcome of the trial, we need not address the issue of whether the lack of objection constitutes deficient representation. *Bradley*, 42 Ohio St.3d at 142 quoting *Strickland*, 466 U.S. at 694; *Kordeleski* at P37.  Frashuer's third assignment of error is overruled.

*Frashuer*, 2010-Ohio-634 at ¶¶35-38.

-21-

The state appellate court applied the correct governing standard for ineffective assistance of trial counsel claims.  Neither on direct appeal nor before this Court, has Frashuer explained how trial counsel's lack of an objection prejudiced his defense and affected the outcome of the trial. It defies logic to argue that, had the oath been administered earlier in the proceeding, the outcome would have been different.  Moreover, it is quite possible trial counsel made a strategic decision to not challenge the irregularity for any number of reasons.  He or she may have believed that the empaneled jury was sympathetic to his client or that the prosecution did not present a particularly strong case.  In such a scenario, a new trial may have been an undesirable outcome.  This Court, however, cannot find counsel was ineffective simply because Frashuer was ultimately convicted.  "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'"  *Harrington*, 131 S. Ct. at 788 (internal citations omitted).

As the state appellate court was neither contrary to, nor an unreasonable application of clearly established federal law, Frashuer's second ground for relief is also without merit.

### V.  Conclusion

For the foregoing reasons, it is recommended that Frashuer's Petition be DENIED.

/s/ Greg White
U.S. MAGISTRATE JUDGE

Date: February 17, 2012

-22-

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).